In re G.G., Jr.

In re A.P.

In re E.P.

In re T.P.

In re L.P.

In re T.P.

In re J.P.

In re G.G.

In re D.J.

In re R.S.

and

In re R.J.

Nos. 94–FS–1128, 94–FS–1138, 94–FS–1139, 94–FS–1140, 94–FS–1141, 94–FS–1144, 94–FS–1145, 94–FS–1352, 94–FS–1371, 94–FS–1372 and 94–FS–1373.

District of Columbia Court of Appeals.

Argued June 27, 1995.
Decided Nov. 20, 1995.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Garland Pinkston, Acting Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, Washington, DC, were on the brief, for the District of Columbia.

William D. Wallace, with whom J. Michael Klise, Susan M. Hoffman, Howard B. Crystal, and Jennifer A. Bensch, Washington, DC, were on the brief, for appellees A.P., E.P., Tam. P., L.P., Tas. P., and J.P.

Richard Morvillo, Washington, DC, entered an appearance for A.P., and E.P.

Shirim Ikram, Potomac, MD, entered an appearance for appellees A.P., E.P., Tam. P., L.P., Tas. P., and J.P.

James S. Kohm, D.C. Law Students in court, for appellee R.S.

Robert J. Warner, Brooklyn, NY, for appellee mother, D.G.

Evangeline Covington, guardian ad litem, Washington, DC, filed a supplemental statement in lieu of brief for appellee G.G., Jr.

T. Michael Barry, Olivette, MO, filed a brief for appellee father, J.P.

Madhavan K. Nair, Herndon, VA, filed a brief for appellee mother, E.P.

Yvonne B. Lewis, Springfield, VA, guardian ad litem, filed a statement in lieu of brief for appellees D.J., and R.J.

Lauren S. Kahn, McLean, VA, appointed by the court, filed a brief for appellee mother, T.J., mother of D.J. and R.J.

Diane Weinroth, Washington, DC, guardian ad litem, filed a statement in lieu of brief for appellee R.S.

Holly H. Thomas, Columbia, MD, appointed by the court, for appellee mother, C.S.

Richard M. Landis, Cincinnati, OH, filed a statement in lieu of brief for appellee father, R.C. Daniel I. Oshtry, Washington, DC, entered an appearance for father, G.G., Sr.

Before TERRY and KING, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

The District of Columbia (the "District") appeals the trial court's grant of appellees' motions to require the District of Columbia Department of Human Services (DHS), through the Department of Public and Assisted Housing (DPAH),[1] to provide them with immediate public housing ahead of those on the waiting list. We agree with the District that D.C.Code § 16–2320(a)(5) does not give the trial court the authority to order DPAH to place the families of neglected children in public housing ahead of those already on the waiting list, and thus we reverse the trial court's rulings.

## I.

Appellees are members of four families, the G. family, the J. family, the S. family, and the P. family.[2] In each case, a petition was filed alleging that the parents neglected the children. Each parent accused of neglect filed a stipulation admitting that he/she neglected his/her children. Each parent then filed a motion requesting the trial court to

---

1. The District of Columbia Housing Authority Act of 1994, D.C.Law 10–243, 42 D.C.Reg. 91 (Jan. 6, 1995), abolished DPAH and created the D.C. Housing Authority, which is governed by a Board of Commissioners appointed by the Mayor and administered by an executive director. The purpose of the Act was to create an independent housing authority that would have the powers necessary to provide quality public housing.

D.C.Code § 5–121 (1995 Repl.). We will refer to the housing authority as DPAH to avoid any confusion.

2. This court consolidated the appeals on December 2, 1994, and granted a motion to expedite the appeals on March 28, 1995.

order DPAH to provide immediate public housing, the absence of which was the only obstacle to reunification with the children. The trial court in each case granted the motion, citing D.C.Code § 16–2320(a)(5) which authorizes the court to order the District to provide such "services" which are in the "best interests of the child." The District appeals the decision of each trial court and argues that D.C.Code § 16–2320(a)(5) does not give the court the authority to force DPAH to place the families of neglected children in public housing immediately, thus disregarding its own system of preferences and waiting lists.[3]

## II.

The issue before this court is whether the trial court has the power pursuant to D.C.Code § 16–2320(a)(5) to order DPAH to provide immediate public housing to the families of neglected children.[4] D.C.Code § 16–2320(a)(5) states:

> The [Family] Division may make such other disposition as is not prohibited by law and as the Division deems to be in the best interests of the child. The Division shall have the authority to (i) order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within such agency's legal authority. . . .

D.C.Code § 16–2320(a)(5) (1989 Repl.).[5] The trial court in this case reasoned that DPAH is a public agency that provides a service, *i.e.*, housing, to residents of the District in need, and therefore the court can authorize

3. With respect to the G. family, the District also asserted that G.G.'s mother left public housing in 1990 owing $3,237.97 and that the District was under no legal obligation to place her in public housing. 14 DCMR § 6102.4 states: "Any applicant determined to be a former tenant with an outstanding debt owed to DPAH shall not be eligible for selection for housing until that debt has been paid in full." The court rejected this argument citing the federal housing regulations, upon which the District's housing regulations are based, which state that an applicant "may" be excluded from eligibility for public housing if the applicant previously failed to pay rent. *See* 24 C.F.R. § 882.210 (1995). Moreover, the court noted that the District did not provide the court with proof that the mother was delinquent in her rent, the District never sought repayment of the debt owed by G.G.'s mother, and 14 DCMR § 6102.4 does not take precedence over the plain language of the neglect statute, specifically D.C.Code § 16–2320(a)(5), which focuses on the best interests of the child.

The S. family, which consisted of R.S., his mother, three siblings, and maternal grandparents, requested the court to order DPAH to move the family from their two bedroom unit to a four bedroom unit. The District claimed that the grandmother, who was the tenant named in the lease of the two bedroom unit, never requested a transfer to a larger unit or sought to modify the lease to include her daughter and four grandchildren. Moreover, the District argued that even if the grandmother wanted to add her adult daughter to the lease, she would be unable to do so according to 14 DCMR § 6205.5, which states that "the [District] shall add names to the dwelling lease, after initial occupancy only as a result of birth to an existing family member on the lease, or other changes to the family as a result of the operation of law (such as marriage, adoption or custody)." The trial court, however, held

that the daughter and four grandchildren could be added to the lease because the trial court's order operates as a "change[] to the family as a result of the operation of law." 14 DCMR § 6205.5 (1991).

In light of our ultimate holding, *infra*, we need not determine whether the trial court's rulings with respect to these issues were erroneous.

4. The J. family argues that the issue is moot because: (1) a trial court put DPAH into a temporary receivership and therefore DPAH is no longer a "public agency;" and (2) the District implemented an amended tenant selection plan which would give priority for the issuance of vouchers for private housing to 25 families referred from the Family Division. Neither reason creates a mootness problem; a receivership does not make a public agency private, and the issuance of priority vouchers for private housing is not the same as ordering DPAH to provide immediate public housing to families of neglected children. The G. family argues that because DPAH complied with the trial court's order, the issue is moot. Clearly, compliance with a court order does not preclude an appeal of that order. *See Tidwell v. Schweiker*, 677 F.2d 560, 565 (7th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 806 (1983); *see also McClain v. United States*, 601 A.2d 80, 81 (D.C.1992) (" 'In general a case becomes moot when the issues presented no longer "live" or the parties lack a legally cognizable interest in the outcome' " (citation omitted)).

5. Title IV of the Prevention of Child Abuse and Neglect Act of 1977, entitled "Neglect Proceedings Amendment Act of 1977," substantially amended Chapter 16 of the D.C.Code. This includes Section 407(b), which amended D.C.Code § 16–2320(a)(5).

DPAH to provide housing to neglected children. The District on the other hand, contends that housing is not a "service" as intended by the statute, and DPAH has its own regulations which cannot be superseded by the neglect statutes.

■ When interpreting the language of a statute, this court examines the plain meaning of the language used and, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *West End Tenants Ass'n v. George Washington University,* 640 A.2d 718, 726 (D.C.1994) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2055, 64 L.Ed.2d 766 (1980)); *see National Org. for Women, Inc. v. Scheidler,* —— U.S. ——, ——, 114 S.Ct. 798, 806, 127 L.Ed.2d 99 (1994). If the words are unambiguous, this court will give effect to the statute's plain meaning, "keeping in mind that the intent of the legislature is to be found in the language which it has used, and words should be construed according to the meaning commonly attributed to them." *Tenants Ass'n, supra,* 640 A.2d at 726 (citations omitted). This court will not give effect to a plain language interpretation which is "plainly at variance with the policy of the legislation as a whole." *Id.* at 726 n. 14 (quoting *United States v. American Trucking Ass'n,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940)). "Where the legislature has not defined words used in the act, the court must then determine the meaning of the language in accordance with the legislative intent and common understanding to prevent absurdities and to advance justice." 1A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 20.08 (5th ed. 1993).

■ A service is defined as "a facility providing the public with the use of something, such as water or transportation." THE AMERICAN HERITAGE DICTIONARY 1185 (1976). Social services refer to those services "of or pertaining to society." *Id.* at 1225. Public housing can arguably be considered a social service because the District is essentially providing economically disadvantaged families with the use of public housing. We believe, however, that in the context of the Prevention of Child Abuse and Neglect Act of 1977 (the "Act"), in which D.C.Code § 16–2320(a)(5) is included, the term "services" was not meant to include providing public housing to the families of neglected children.

■ Our holding is consistent with sections of the D.C.Code which were also amended pursuant to the Act and which use the term "services." *See* D.C.Code §§ 6–2105(a), –2107, –2121 to –2127 (1995 Repl.). "It is a canon of statutory interpretation that one looks at the particular statutory language within the context of the whole legislative scheme when legislative intent is to be determined." *Citizens Ass'n of Georgetown v. Zoning Comm'n of the District of Columbia,* 392 A.2d 1027, 1033 (D.C.1978) (en banc). D.C.Code § 6–2105(a) states:

> In cases in which a child is alleged to be a neglected, but not an abused, child the Division shall determine whether the child should be removed from the home or can be protected by the provision of *services* or resources. If in the opinion of the Division the available *services* or resources are insufficient to protect the child and there is insufficient time to petition for removal, the Division shall request the police to remove the child. . . .

D.C.Code § 6–2105(a) (1995 Repl.) (emphasis added). Clearly, the statute there makes a distinction between removing the child from the home and providing services, thus indicating that the term "services" does not include providing public housing for the entire family.

Similarly, D.C.Code § 6–2107 provides for the initial investigation by the Intrafamily Branch of the Social Services Division of the Superior Court and lists various services available to the Branch to aid the family. These enumerated services are not exclusive, but regardless, they do not include providing the entire family with immediate public housing. Moreover, D.C.Code §§ 6–2121 through –2127, which created the Child Protective Services Division of DHS, stated that this Division must "provid[e] ... *services* on behalf of the child designed to help parents recognize and remedy the conditions harmful to the child and to fulfill their parental roles more adequately." D.C.Code § 6–2121(a)(4)

(1995 Repl.) (emphasis added). Section 6–2123 lists the various services available to the Chief of the Division, none of which deal with providing permanent public housing.

The only mention of the role of DHS in aiding the family of the neglected child is in § 6–2121(c), which states that DHS shall help the Division "by providing to the family of such child *services* which are aimed at reuniting the family as quickly as possible." D.C.Code § 6–2121(c) (1995 Repl.) (emphasis added). The use of the term "services" in this context clearly does not include ordering DHS, through DPAH, to provide immediate public housing to families of neglected children. The term "services" is only meant to encompass those actions that will enable a neglected or abused child to be reunited with his family and return to a safe domestic environment absent such abuse and neglect.

The legislative history also supports our conclusion that trial courts do not have the authority to order DPAH to provide housing to neglected children and their families. The REPORT OF THE COMMITTEE ON THE JUDICIARY ON TITLE IV OF BILL No. 2–48, "THE PREVENTION OF CHILD ABUSE AND NEGLECT ACT OF 1977" (March 29, 1977) (hereinafter "Committee Report") states in pertinent part:

> Title IV of Bill No. 2–48 addresses the need for provision of services to families and children by mandating the continual accountability of social service agencies to the court at each stage of the neglect proceedings ... Section 407 provides a statutory mandate that there be regular post-disposition review by the court of plans to provide services to children and their families.
>
>    \*    \*    \*    \*    \*    \*

Subsection (b) of section 407 amends paragraph (5) of subsection (a) of section 16–2320 of the D.C.Code, which permits the Division to make any "disposition as may be provided by law and as the Division deems to be in the best interest of the child and community." The proposed language is intended to clarify that the Division may order specific dispositions and services that it deems to be in the best interests of the child so long as they are not beyond the legitimate authority of the agency or agencies providing service in any particular case. New York has a similar statute, Section 255 of the Family Court Act,[6] which has worked well and has served as a model for this subsection.

Committee Report at 5–6, 20. The Committee noted that the purpose of the legislation was to "marshal all existing facilities for addressing the problem of child abuse and neglect in the District of Columbia." Committee Report at 2. The Committee further elaborated:

> The aim of Title IV, "The Neglect Proceedings Amendment Act of 1977," is to promote the best interests of any child in the District of Columbia who is alleged by petition filed in the Family Division of the Superior Court to be neglected, abandoned or abused. Specifically, this portion of Bill 2–48 provides a statutory framework for insuring that such children and, where appropriate, their families receive effective social services aimed at: (1) promoting the physical and social health of the subject child; (2) reestablishing a wholesome family unit, if possible; and (3) in cases where the natural family unit is likely to remain detrimental to the child's best interests,

---

6. Section 255 states:

> It is hereby made the duty of, and the family court or a judge thereof may order, any state, county and municipal and school district officer and employee to render such assistance and cooperation as shall be within his legal authority, as may be required, to further the objects of this act....
>
>   .... [The family court may] render such information, assistance and cooperation as shall be within its legal authority concerning a child who is or shall be under its care, treatment, supervision or custody as may be required to further the objects of this act.

> The court is authorized to seek cooperation of, and may use, within its authorized appropriation therefor, the services of all societies or organizations, public or private, having for their object the protection or aid of children or families, including family counselling services, to the end that the court may be assisted in every reasonable way to give the children and families within its jurisdiction such care, protection and assistance as will best enhance their welfare.

N.Y. Fam. Ct. Act § 255 (1994).

providing a permanent domestic environment for such child as soon as possible. Committee Report at 1 (*emphasis in original*).

Clearly, the legislative intent was to create a provision which will enable the Family Division to work with other social service agencies in providing care in the best interests of the child and working towards a goal of creating a wholesome family unit absent abuse and neglect. The District of Columbia Council enacted § 16–2320(a)(5) to enable the courts to ensure that neglected children and their families did not get lost in the system. The statute, however, was not meant to grant the courts the authority to force an independent agency that, although arguably a social service agency, is not entirely devoted to the care of children, to ignore its own policies and waiting lists and place specific neglected children in public housing. Although the trial courts had good intentions, their actions went one step beyond the Act's goal of "addressing the problem of child abuse and neglect." *See* Committee Report at 2.

Because D.C.Code § 16–2320(a)(5) is modeled after N.Y. Fam. Ct. Act § 255, we find prior constructions given to that statute very persuasive. "When the legislature of a state adopts a statute which is identical or similar to one in effect in another state or country, the courts of the adopting state usually adopt the construction placed on the statute in the jurisdiction in which it originated." 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 52.02 (5th ed. 1992); *see Whitt v. District of Columbia*, 413 A.2d 1301, 1303–04 (D.C.1980) (noting that "when one jurisdiction adopts in similar form a regulation of another, it is deemed to have adopted prior construction of the regulation....").

A New York Supreme Court in a well-reasoned opinion ruled that under N.Y. Fam. Ct. Act § 255, the Family Court of New York did not have the authority to order the New York Housing Authority to supply immediate housing for parents and children who were the subject of family court proceedings. *New York City Housing Auth. v. Miller*, 89

Misc.2d 141, 390 N.Y.S.2d 806 (N.Y.Cty., Spec.Term 1977). The court found that although the housing authority is responsible to some extent for child care, it is not a child care agency, and thus there is no "constitutional or statutory obligation imposed upon the Authority or power conferred upon the Family Court to interfere with legally established Authority policies and procedures as to tenant selection or to permit blanket orders to the Authority to confer specific benefits upon specific persons in disregard of the Authority's constitutional and statutory obligations and established procedures." *Id.* 390 N.Y.S.2d at 808.

The court stressed in *Miller* that the purpose of § 255 was to allow the Family Court to "eliminate bureaucratic red tape and overcome the lack of interagency cooperation which combined to frustrate the provision of services for families and children." *Id.* The Family Court, however, cannot supersede the rules and procedures of the Housing Authority, which is an independent agency, said the court. *Id.* Thus, the court concluded that the statute does not confer upon the courts the power to direct the Housing Authority to provide immediate housing for specific families within the court's jurisdiction. *Id.*

We believe the same analysis should apply here. The purpose of D.C.Code § 16–2320(a)(5) is to allow the courts to require various social service agencies to provide assistance to families and children who are victims of child abuse and neglect. The DPAH, however, is a completely separate agency which, although also committed to "child care," is responsible for providing public housing for all residents deemed in need within the District. The trial courts cannot supersede this function and order DPAH to provide immediate housing to families within the jurisdiction of the Family Division. To do so would act to the detriment of many residents in need of public housing, and would undermine the rules, provisions, and function of DPAH, a government agency independent of the Family Division of the District of Columbia Superior Court.[7] More-

---

7. The trial court in *In re D.I.*, 113 Daily Wash. L.Rptr. 1293 (D.C.Super.Ct. June 26, 1985), distinguished the *Miller* case by noting that DPAH is an executive agency while the New York Housing Authority is a completely independent agency. This is a distinction we find irrelevant. DPAH is

over, such action exceeds the statute's stated goal of addressing and remedying the unsafe domestic environment of children. The statute was enacted in order to protect children from the abuse or neglect of a parent and to prevent the parent from harming the child again, either through foster care or services that would teach the parent to fulfill his parental role more adequately. *See* D.C.Code § 6–2121(a)(4) (1995 Repl.). Providing public housing would not necessarily remedy the abuse or neglect of a child.

Appellees rely on the trial court's reasoning in *In re D.I., supra* note 7, 113 Daily Wash.L.Rptr. at 1293, where the trial court granted a motion ordering DPAH to provide immediate public housing for D.I. and his three siblings, who were all adjudicated neglected, and their mother. The court stated that the purpose of § 16–2320(a)(5) was to promote "the best interests of the child" and thus public housing must be included within the "services" the trial court can order an agency to provide. 113 Daily Wash.L.Rptr. at 1298. The trial court also cited to the legislative history, which noted that the purpose of the statute was to "reestablish[ ] a wholesome family unit if possible." *Id.* at 1298; *see* Committee Report at 1. Finally, the court distinguished *Miller* by stating that New York's § 255 authorized the court to "seek assistance, cooperation or information" from an agency whereas § 16–2320(a)(5) contained a broader grant of power that enabled the trial court to "order a public agency ... to perform acts within its legitimate authority." *In re D.I., supra* note 7, 113 Daily Wash.L.Rptr. at 1300.

We disagree with the trial court's decision in *In re D.I.* and thus decline to adopt it here. Although the overall goal of § 16–2320 is to promote the reunification of the family, the legislature expressed its intent to achieve this by "addressing the problems of child abuse and neglect" through "effective social services." Committee Report at 1, 2. The legislative history stated that the purpose of the Prevention of Child Abuse and Neglect Act is to correct "the major weaknesses of

our child abuse/neglect system ... (1) gaps in service, (2) duplication of services, and (3) the inaccessibility of services." Committee Report at 5. The Committee further stated that "enabling legislation is needed for insuring the provision of services to families and children who find themselves thrust into the child abuse/neglect system. Both portions of Bill No. 2–48 ... are aimed at meeting the social and rehabilitative service needs of families and children." *Id.*

Thus, the legislative intent supports our view that the purpose of the Prevention of Child Abuse and Neglect Act, and specifically § 16–2320(a)(5) was to enable the Family Division to organize and consolidate the various services available to families of neglected children and to create a permanent and safe domestic environment for them. Requiring DPAH to provide immediate public housing to continue this goal, however, is beyond the reach of the statute. Once an environment without abuse and neglect has been secured for the child and his family, the trial court can no longer use § 16–2320(a)(5) to aid that family. By ordering DPAH to provide housing to the families of neglected children, the trial court presumed that the situation of these families is worse than that of other families on the waiting list for public housing. This of course is not automatically the case. Families on the waiting list may include families with children who are currently considered for imminent placement in foster care due to their current housing, or families who are living in conditions which pose an imminent threat to life or safety rendering their current residences uninhabitable,[8] as well as families threatened with the loss of children to foster care, and also families whose reunification with their children then in foster care is at risk. *See* 14 DCMR § 6102.2 (1991).

Many of the people on the waiting list for public housing may be in a worse situation than the appellees, and it is not up to the trial court to decide who is entitled to priority housing. The DPAH has its own regulations and provisions which must be respected

a separate agency that has its own regulations, procedures, and provisions, which cannot be superseded by the trial courts. See *supra,* note 1.

**8.** *See* 42 U.S.C.Ann. § 1437d(c)(4)A(ii)(III) (1994).

by the trial courts. Moreover, while N.Y. Fam. Ct. Act § 255 and D.C.Code § 16–2320(a)(5) are not identical, the legislative history of § 16–2320(a)(5) noted that the statute was based on § 255, and thus we find the *Miller* case, which interpreted § 255, persuasive here.

Accordingly, we find that the trial court cannot order DPAH to provide immediate public housing to the families of neglected children, and thus we reverse the orders of the trial courts.[9]

*So ordered.*

---

9. In light of our decision, we need not address the District's second argument that the mandatory injunctions ordered by the trial courts interfered with DPAH's administration of the District's housing program.