**In re C.W.**

**District of Columbia, Appellant.**

**No. 05–FS–847.**

District of Columbia Court of Appeals.

Argued Nov. 9, 2006.
Decided Feb. 1, 2007.

Jason Lederstein, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, and Todd S. Kim, Solicitor General, were on the brief, for appellant.

David H. Stringer for appellee C.W.

Lewis Franke, appointed by the court, filed a statement in lieu of brief for appellees W.D. and G.D.

Before: FARRELL and REID, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

On July 14, 2005, following a child neglect review hearing at which no testimony was taken and no opportunity for cross-examination (or for pre-hearing discovery) was provided, a judge of the Family Court ordered the District of Columbia, through its Child Family Services Agency (CFSA), to pay C.W., a ward of CFSA who was

then one day short of her twenty-first birthday, the sum of $9820.56. The award was based on an allegation that certain foster care funds paid by CFSA to C.W.'s foster parents, G.D. and W.D., were not distributed to C.W. or used for her benefit, and that by failing to take adequate measures to prevent Mr. and Mrs. D. from diverting to their own use money intended for C.W., the District had failed to fulfill its legal responsibilities to C.W. The District has appealed from the trial judge's order on several grounds, but we reach only its contention that the claim made on C.W.'s behalf could properly be resolved only in a civil action in which all of the procedures and protections available at such a proceeding would be observed, and that such a claim is not an appropriate subject of a non-evidentiary child neglect review hearing.

We agree with the District. The only possible theory under which the District could be held liable to C.W. for the amount awarded is that the District was negligent in failing to prevent the foster parents from enriching themselves at C.W.'s expense. We conclude that the Family Court, holding a neglect review designed to assure for a child an environment free from abuse or neglect, is not the proper forum to determine whether the District should be held liable for its alleged negligence and, if so, in what amount. Accordingly, we reverse the trial court's decision and vacate the award, without prejudice to any timely civil proceeding which C.W. may seek to initiate.

# I.

## BACKGROUND

A. *C.W.'s history.*

C.W. was born on July 15, 1984. For the first sixteen years of her life, she lived with a succession of relatives. On June 21, 2001, shortly before her seventeenth birthday, C.W. was adjudicated by the Superior Court to be a neglected child pursuant to what is now D.C.Code § 16–2301(9)(A)(7) (2006). C.W. was committed to the custody of CFSA, and she was placed with W.D., who at that time was not yet a licensed foster parent. By January 2003, Mr. and Mrs. D. had both received their foster care licenses, and C.W., then 18½ years of age, became their foster child.

When C.W. was sixteen years old, she apparently engaged in disruptive behavior which led her custodian to state that she could no longer keep C.W. in her home. Under the care of Mr. and Mrs. D., however, C.W. thrived. She graduated from high school, and in the fall of 2003, she enrolled at the University of Maryland Eastern Shore (UMES), with the intention of becoming a pediatric nurse. C.W. apparently did well during her first year at UMES. She lived on campus, but she continued to reside with Mr. and Mrs. D. during vacations and breaks from school, and she came home on some weekends. Meanwhile, Mr. and Mrs. D. continued to receive foster care payments from CFSA.

The trial judge held regular neglect review hearings with respect to C.W.'s case, although C.W. was excused from attending most of them. At a hearing on September 30, 2004, a CFSA social worker reported that C.W. was an outgoing, well-behaved and motivated young woman. The trial judge, who plainly regarded C.W. as a "success story," was concerned about C.W.'s future after she "aged out" of the neglect system on her twenty-first birthday. The judge inquired regarding what, if any, financial assistance C.W. would be in a position to receive in order to be able to complete her education after her neglect commitment to CFSA ended. In December 2004, responding to the judge's concerns, CFSA filed an "Independent Living

Transition Plan" for C.W. In that plan, CFSA listed several prospective sources of financial assistance for C.W., including certain federal grants, the District of Columbia Tuition Assistance Grant Program, and the "Center of Keys for Life Program." The judge was evidently satisfied that the agency had made reasonable efforts to assist C.W. in achieving her goals for independent living, and she anticipated, as did the attorneys and social workers in the case, that C.W. would continue to live with Mr. and Mrs. D. after her twenty-first birthday. Prior to July 2005, no friction between C.W. and her foster parents was reported to the court by anyone.

## B. *The final review hearing.*

The final review hearing in C.W.'s child neglect case was scheduled for July 7, 2005, eight days before her twenty-first birthday. On the day preceding the hearing, the CFSA social worker, supplementing a previous report, informed the court that C.W. had abruptly left the home of Mr. and Mrs. D. as a result of conflict with the foster parents over money. C.W. had related to the social worker that she had received very little financial assistance from Mr. and Mrs. D. while she was living on campus at UMES, and that when she asked them for help, they told her that they were saving for a new home. The social worker reported, and C.W. subsequently confirmed at the July 7 hearing, that C.W. would occasionally have to borrow money from members of her family in order to "get by." C.W. acknowledged to the social worker, however, that when she needed to repay a relative for a loan, Mr. and Mrs. D. would provide her with the money.

Shortly before the July 7, 2005 hearing, and after her dispute with her foster parents came to a head, C.W. moved in with her grandfather at the grandfather's three-bedroom home. C.W. explained to the social worker that she had not told anyone about her financial difficulties because she felt indebted to Mr. and Mrs. D. for taking her into their home. As a result, C.W.'s court-appointed guardian *ad litem* (GAL) was unaware of the problem prior to its disclosure on the eve of the final neglect review hearing.

At the outset of that hearing, the trial judge, plainly motivated by her responsibilities to C.W. as *parens patriae*, expressed concern about the reported estrangement between C.W. and the foster parents and its potential consequences for C.W.'s future. The judge asked rhetorically: "How did we get to this place eight days before [C.W.] turns twenty-one?" She requested C.W. to relate what had happened, and C.W. responded as follows:

Well, when I went to college, I never really asked them for anything. I just was happy, like that they would let me stay with them. So, I ain't never pressed them for no money. But like recently, like the first year I went to college, I didn't get anything until April, and I had been in college since September.

And they brought that down. And then, July I got $400 to go to Missouri—Kansas. And then, like every time I'd call home they would be, like: Can you work with us? We're trying to get this house. We'll send you something when we get it. And then, I'll tell them that I borrowed some money from somebody and, then, they'll send it to me because I tell them I got to pay them back.

But when I came home, I was asking for money to get to work because I ain't had no money when I came home. They'll give me just enough to get to work and back. And then, they'd be like—they never ask, do I need something for lunch or anything? Every time they gave me

money, that's my last. Dang, that's my last. I don't have it like that.[1]

The judge's reaction to C.W.'s narrative, and to the situation that the narrative revealed, was that CFSA should have monitored the foster parents' use of the money paid to them by the District, and that if money was diverted from C.W. by the foster parents, then the District had the obligation to compensate C.W. The judge's approach is captured in the following exchange with the GAL:

> THE COURT: In other words, it's my feeling that if X amount of money is to go to a kid and she doesn't receive it from the Agency, the Agency who hired the D.s, the Agency owes her the money. They can collect from the D.s and that's their business.
>
> But if the D.s were required by the rules to give her X amount of money per month and didn't, then, CFSA still owes her that money. Don't you think?
>
> MR. STRINGER[2]: I would like to think that.
>
> THE COURT: Well, figure out a way to think it. Come up with some legal theory. We've got seven, six days. And how they deal with the D.s is none of my business and I agree with you. I don't think I have any legal authority or responsibility.

The judge added that

> I do want you to look to see if there is any legal basis whatsoever under which we could require CFSA to pay back C., at least for the money that should have been coming to her that she did not get.

Although the judge did not use the term "negligence," she made it clear that, in her

view, the agency had not exercised due care vis-a-vis C.W.:

> [W]hat it sounds like to me is, they kept paying money; not getting an accounting; not finding out specifically how much of that money went to C. And now, they're finding out not much did. And, they've just been paying out this money for foster care when she—we all knew she wasn't there.

Counsel for the District remonstrated that "with all due respect, I think the appropriate mechanism is really through a civil action of fraud as to the D.s." The judge acknowledged this possibility, but she was not persuaded:

> Well, it may be. But, my only mechanism right now is to hold CFSA accountable to this child and that's what I'm going to do. We've got such a short time because we found this out at the last minute. CFSA, once I issue an order, can take me up to the Court of Appeals. I don't care. But they will in doing that, show what little work was done to ascertain—well, we've got a kid in college—financially what her resources were.

The judge further emphasized that

> this is government money that's being paid to provide a home for someone who isn't there because we're actually paying someone else to provide the home, because we're paying this school for her to go there, so, we're paying two places. So, we need to make sure that the money is being spent wisely. I mean, that's just basic stuff.

The judge also made it clear that in her view, the Family Court's role went beyond assuring that C.W. was not abused or ne-

---

1. C.W.'s statement was not made under oath. Neither C.W. nor any other person was sworn as a witness at the July 7, 2005 review hearing.

2. David H. Stringer, Esquire, C.W.'s guardian *ad litem*.

glected. Rather, the judge was concerned that because of the alleged retention by Mr. and Mrs. D. of funds intended for C.W.'s benefit, C.W. would not have as much spending money while she was a student as she would otherwise have had. In the judge's view,

> [C.W.'s] job was to go out and—within reason—work hard and party this summer. Okay? She's about to turn 21. She's doing well in college. She's earned it. She's earned the fun and the great stuff that goes with it.

> And—but she's also earned the right to have some emotional security and stuff like that which I had thought we had given her. And if I can't give her that, well, then, if she's staying with her grandfather who is retired, I need to give her a little financial security for right now. And because—I'm sure she was counting on the money for summer to kind of help her a little bit, over the hump for the fall. But if she has to now use that money just to survive this summer, I mean, there's something wrong with this picture.

> \* \* \*

> I mean, the purpose of the money, if there is money, would be to give her a little jump on her expenses for school and the rest of the summer so she doesn't have to—she's got money.

Because only a few days remained before C.W.'s twenty-first birthday, the judge told the GAL that time was of the essence, and that "I want a motion I can rule on before next week." The judge also directed CFSA to file a detailed accounting of all foster care funds paid to Mr. and Mrs. D. beginning with the date on which C.W. had enrolled at UMES. On July 11,

2005, the agency filed a report as ordered. According to the CFSA social worker, the foster care payments made to Mr. and Mrs. D. that could not be attributed to housing or to the cost of C.W.'s care during school breaks totalled $9820.56. The report also stated that "[a]ccording to some of [C.W.'s] estimates, she only received approximately $6260.73 in assistance from the [D] family in the past five years." The estimated amount was "based on the CFSA foster care payment board rate as well as information provided by [C.W.]." According to the report, Mr. and Mrs. D. did not make themselves available for interview.[3]

### C. The GAL's motion and the trial court's order.

On July 12, 2005, the GAL filed a "Motion for Reimbursement of Foster Care Payment." In his motion, the GAL represented that C.W. had received from the foster parents $300 in April 2004, $400 in July 2004, and $300 in February 2005, as well as "modest gifts of personal items." He further alleged that, according to its own report to the court, "[CFSA], wh[ich] contracted with the foster parents to provide care for C.W., did not monitor the use of the money paid out to Mr. and Mrs. D. or require an accounting." The GAL asserted that Mr. and Mrs. D. had moved to a new home, that they had informed C.W. that she was no longer a part of their family, and that C.W. was now faced with the previously unanticipated prospect of having to support herself during her final two years of college. Characterizing this situation as "unconscionable," the GAL claimed that the foster parents and the agency were in breach of their respective duties to support C.W., and he urged the

---

3. The foster parents likewise did not attend the July 7, 2005 review hearing, although their attorney was present.

court to "exercise its equitable powers to fashion a remedy that provides reasonable reimbursement to [C.W.][4]. . . ." Noting that, according to the agency, Mr. and Mrs. D. received twenty-three monthly payments of approximately $847.00 for a total of $19,481.00, the GAL argued that payment to C.W. of half of that sum would be "in keeping with the intended purpose of foster care payments and fully justified by the history described above."

On July 13, the District filed a response in which it opposed what it called the GAL's "fictionally based calculation." According to the District, "CFSA has, in fact, ensured that all of [C.W.'s] needs have been met and that her education and other service and needs have been paid for through the Center of Keys for Life and related federally funded program." The District acknowledged that there was a need for CFSA to "develop specific policy guidelines for foster parents as to how foster [care] payments are to be spent, particularly for youth attending college." Nevertheless, according to the District, all of C.W.'s needs during the period in question had been fully satisfied, and C.W. was not entitled to any reimbursement from the District.[5]

On July 14, 2005, the trial judge entered an order effectively granting the GAL's motion. The judge summarized the facts before her as follows:

> [T]he only evidence [6]presented to the [c]ourt, the social worker's report and [C.W.'s] statements in open court,[7] indicate that [C.W.'s] basic needs were not always met. Absent substantive proof

to the contrary, the [c]ourt must base its decision upon the evidence presented. According to CFSA, [C.W.] had indicated that her current foster parents have provided her with approximately $6260.73 since September 2003, but there is no source or any documentation to support their [sic] position. [C.W.'s] statements on the record totally dispute this contention.

The judge wrote that she was

> not persuaded by CFSA's claims that it ensured that all of [C.W.'s] needs were met, especially in the face of CFSA's failure to monitor how the foster care payments were being spent and its extremely late discovery of [C.W.'s] claims that she often had to call for help from other family members during the school year just to "get by."

Relying on D.C.Code § 16–2320(a)(5) (2001) for her authority to do so, the judge ordered CFSA to provide a check in the amount of $9820.56 to the GAL, for the benefit of C.W., no later than 5:00 p.m. on August 12, 2005.

The District filed a timely appeal, and on September 12, 2005, this court stayed the trial judge's order pending the outcome of the appeal. We now reverse.

## II.

### ANALYSIS

During the July 7, 2005 hearing, as we have seen, counsel for the District took the position that the judge's apparent determination to provide monetary relief to C.W.

---

4. Monetary compensation or reimbursement is, of course, a legal remedy rather than an equitable one.

5. Counsel for Mr. and Mrs. D. also submitted a last-minute response to the GAL's motion, but the trial judge rejected this submission as untimely.

6. Although the judge used the term "evidence," there was no evidence in the sense of sworn testimony.

7. The only relevant statement by C.W. is the one quoted on page 5, *supra*.

should be the subject of a civil action, rather than of a neglect review. In its brief on appeal, the District elaborated on this theme as follows:

Even if a payment of money could be ordered under D.C.Code § 16–2320(a)(5) (2001), the [o]rder by Judge Shuker went beyond the provision's purpose as it sought to rectify a prior error that was not linked with a present injury to the child. The [o]rder was based on a determination that the Agency had a legal duty to ensure that foster care payments to the D's were used strictly for the benefit of C.W., to be directly transferred to C.W. while she was at college, if necessary. Finding that the Agency breached that duty, the court awarded monetary relief to C.W. *In essence, the court resolved a civil action as if it were in the Civil Division of the Superior Court, albeit without the procedural protections accorded litigants in resolution of civil claims, such as discovery and trial.* This exceeded the court's role in the post-adjudicatory stage of a neglect case, and was outside the scope of what Congress intended in creating the Family Court.

(Emphasis added.)

The District's position is well-taken. In her understandable determination to protect C.W.'s interests "right now," and to assure that C.W.'s rights were treated as "present rights" and as "warrants for the here and now," *cf. Watson v. Memphis,* 373 U.S. 526, 533, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963), the judge decided in summary fashion, without any sworn evidence, and in the absence of any of the other safeguards that are central to our adversarial system of civil litigation, several difficult contested questions, both as to

liability and as to damages. Here the summary procedure employed by the judge was designed to compensate C.W. for alleged past wrongs, and the questions raised by what was essentially a claim in tort against the District were not suitable for resolution in a proceeding of the kind that was held on July 7, 2005.

In deciding whether the conventional procedures in actions for negligence may be short-circuited in the way that the trial judge dispensed with them in this case,[8] it is important to understand the nature of C.W.'s claim, as perceived by the judge, both in her remarks at the July 7 hearing and in her written order entered seven days later. As the trial judge viewed the case, the District had a duty to C.W. to ensure that payments made to Mr. and Mrs. D. for C.W.'s care were not diverted to the foster parents' own use. If the District did not exercise due care in carrying out that duty, then, under the judge's approach, the District was liable to C.W. for the amount wrongfully retained or diverted by Mr. and Mrs. D. In other words, the substantive questions that the judge sought to resolve were whether the District's allegedly inadequate supervision of the foster parents' use of sums paid to them constituted negligence and, if it did, what amount would fairly compensate C.W.

 It is important to recognize how such a claim would have been handled if it had been presented, as allegations of negligence ordinarily are, in a civil action against the party which allegedly failed to exercise due care, in this case the District. "In an action for negligence, the plaintiff has the burden of proving by a preponderance of the evidence the applicable

---

**8.** This question is obviously one of law, and our review is therefore *de novo.* *See, e.g., Davis v. United States,* 564 A.2d 31, 35 (D.C. 1989) (en banc); *Richardson v. Easterling,* 878 A.2d 1212, 1216 (D.C.2005).

standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *District of Columbia v. Wilson,* 721 A.2d 591, 597 (D.C.1998*)* (citing *District of Columbia v. Watkins,* 684 A.2d 395, 401 (D.C.1996)). In this case, the applicable standard of care—*i.e.,* the nature and amount of supervision the District was obliged to exercise over Mr. and Mrs. D.'s disposition of the foster care payments—was surely "beyond the ken" of the average lay person, and expert testimony would therefore be required. *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988). Where, as here, the alleged negligence related to the claimed failure of an agency of the District of Columbia to prevent wrongful acts by third parties, this court has required an exacting level of specificity in the expert testimony by which the applicable standard of care is sought to be established. *See, e.g., Clark v. District of Columbia,* 708 A.2d 632, 634–35 (D.C.1997). Moreover, in the context of a case of this kind, the plaintiff would have the burden of proving a proximate causal nexus between the defendant's negligence and a present injury of the kind that the standard of care was designed to prevent.

In this case, the applicable standard of care was never mentioned by court or counsel, and no expert testimony (or even lay testimony) was presented. Furthermore, "cross-examination is beyond any doubt the greatest legal engine ever invented for the discovery of truth, [and] it is the principal means by which the believability of a witness and the truth of his or her testimony are tested. Where a witness cannot be cross-examined, the search for truth is severely impaired." *Tyree v. Evans,* 728 A.2d 101, 103 (D.C.1999) (quoting, *inter alia,* 5 JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE, § 1367 at 32 (Chadbourn rev. ed.1974) and *Davis v. Alaska,*

415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)) (internal brackets omitted). In the present case, the District had no opportunity to cross-examine C.W., and the basis for the amount awarded by the trial judge consisted of C.W.'s very vague (and unsworn) account and some plainly arbitrary estimates by the social worker. There are apparent major discrepancies between C.W.'s statement at the hearing on the one hand, and the social worker's account of C.W.'s estimate on the other, with respect to the amounts of money that C.W. received from Mr. and Mrs. D. In our view, it was impossible to resolve these discrepancies without sworn testimony subject to cross-examination. Even if we were to assume, *arguendo,* that there was adequate evidence to establish liability, the amount awarded, under these circumstances, could not have represented more than a guess.

■■■ As authority for making her award, the trial judge relied on D.C.Code § 16–2320(a)(5) (2001), which provides in pertinent part that

> [t]he [Family] Division may make such other disposition as is not prohibited by law and as the division deems to be in the best interests of the child. The Division shall have the authority to ... order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within the agency's legal authority.

As the District points out in its brief, we must construe this broadly phrased provision "in accordance with the legislative intent and common understanding to prevent absurdities and to advance justice." *In re G.G.,* 667 A.2d 1331, 1334 (D.C.1995) (quoting 1A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 20.08 (5th ed.1993)). To construe § 16–2320(a)(5) as

permitting the Family Court, in a neglect review hearing, to award compensation in the thousands of dollars for alleged negligence on the part of the District, without requiring the complainant to introduce legally admissible evidence or to satisfy the applicable substantive legal standards, cannot be reconciled with the language quoted above from our opinion in *G.G.* It does not "advance justice," or even "prevent absurdities," to decide what is really a civil suit for negligence as if it were something else, and to deprive a litigant of the fundamental protections designed to assure the fairness of the adversarial system of civil justice. Indeed, we are constrained to conclude that the order requiring the District to pay compensation to C.W. for alleged negligence, without providing the District with the protections to which it was entitled in such an action, was "prohibited by law" within the meaning of D.C.Code § 16–2320(a)(5).

■ The District also argues that the purpose of a neglect review hearing is to "assure that the respondent will not be neglected or abused in the future, and that such a hearing is not suited for the resolution of civil disputes regarding alleged past wrongful actions or omissions on the part of the District or its agencies." We agree. Moreover, "[o]nce an environment without abuse or neglect has been secured for the child and his family, the trial court can no longer use § 16–2320(a)(5) to aid the family." *G.G.,* 667 A.2d at 1337. The trial court's compensatory award for alleged past wrongs by the District cannot reasonably be viewed as a measure to provide C.W. with a neglect-free or abuse-free environment, and the District's alleged negligence therefore did not proximately cause an injury compensable under our child neglect legislation.

■ We recognize that the court's primary concern, in cases of this kind, must be with the best interests of the child, and that the neglect statute is a remedial enactment which must be liberally construed to permit the court to carry out its obligations as *parens patriae. See In re J.W.,* 837 A.2d 40, 44 (D.C.2003); *In re T.W.,* 732 A.2d 254, 258–59 (D.C.1999). But although the court's authority as *parens patriae* is broad, "it must be exercised within the constraints established by the legislature." *T.S. v. M.C.S.,* 747 A.2d 159, 164 n. 3 (D.C.2000) (citations omitted). It may not lawfully be invoked to dispense with the norms of the adversarial process or to deprive litigants of rights that they would enjoy as a matter of course in the conventional forum for disposing of issues such as the one presented in this case. A determination of liability for negligence, followed by a money judgment, may properly be entered only after a civil trial, frequently before a jury,[9] in which the rights of the parties have been protected through pretrial discovery, sworn testimony, the right to present a party's own witnesses and to cross-examine witnesses called by the opposing party, and the impartial application of the substantive legal standards that govern actions for negligence.

### III.

For the foregoing reasons, the judgment is reversed, and the order requiring payment of compensation to C.W. is vacated, without prejudice to the institution of timely civil proceedings.

---

9. If C.W. had brought a civil action for damages, the District would have had the right, protected by the Seventh Amendment and by Super. Ct. Civ. R. 38, to a trial by jury.

**10.** The trial judge's stated reason for ordering the immediate payment of compensation to C.W., rather than leaving the matter to resolution by civil proceedings, was that in the judge's view, C.W. needed the money "right now." But although a rapid disposition of the issue is obviously tempting—justice delayed is justice denied—the fundamental protections to which civil litigants are entitled cannot simply be by-passed in the hope of achieving the payment of compensation sooner.

Moreover, "[t]his case demonstrates again that the shortest way around is often the longest way through." *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300, 302 (5th Cir. 1973) (quoting *Webb v. Standard Oil Corp.*, 451 F.2d 284, 285 (5th Cir.1971)). The order requiring immediate payment was predictably stayed pending appeal, and one consequence of its issuance may well have been to delay the institution of civil proceedings.