**In re D.K.; District of Columbia, Appellant.**

**No. 10–FS–1574.**

District of Columbia Court of Appeals.

Argued June 28, 2011.

Decided Aug. 18, 2011.

Stacy L. Anderson, Assistant Attorney General for the District of Columbia, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellant District of Columbia.

Allen R. Snyder, with whom Pooja Mehta and Theresa A. Queen were on the brief, for appellee D.K.

Before WASHINGTON, Chief Judge, OBERLY, Associate Judge, and FARRELL, Senior Judge.

OBERLY, Associate Judge:

The District of Columbia challenges a December 6, 2010, Family Court order requiring the Child and Family Services Agency ("CFSA") to pay $1,800 in "eman-cipation funds" to D.K., a neglected child, on his twenty-first birthday. Because we agree with the District that the trial court lacked statutory authority to order CFSA to pay emancipation funds directly to a neglected child, we vacate that portion of the trial court's order requiring CFSA to pay the emancipation funds to D.K.

## I. Facts

D.K. was emancipated by operation of law on December 27, 2010. In anticipation of his emancipation, he appeared at a final permanency hearing before the Family Court on December 6, 2010. Also present at the hearing were, *inter alia*, D.K.'s guardian *ad litem* ("GAL"), a social worker from CFSA, counsel for the District, and a representative of the Jones Independent Living Program ("Jones"). D.K. had lived at Jones since being placed there by CFSA in May 2009. At the hearing, the CFSA social worker informed the court that Jones was closing and that D.K. would have to move out by December 10, 2010, which was four days from the hearing and almost three weeks before D.K.'s emancipation. The parties did not know where D.K. would live after Jones shut its doors, and the hearing concluded without a firm plan in place for D.K.'s living arrangements.[1]

Also at issue was the emancipation money that representatives from Jones had allegedly promised to pay to D.K. on his twenty-first birthday. D.K.'s GAL claimed—and the CFSA social worker agreed—that D.K. was due to receive the funds from Jones as an "incentive" to adulthood, but nobody knew with certainty

---

1. The CFSA social worker indicated that he did not want to place D.K. in a different independent living program ("ILP") for only three weeks. The parties discussed the possibility of D.K.'s staying with his godmother in Virginia, but his probation officer ultimately refused to permit D.K. to move out of the District. Although the record is not clear on this point, it appears that D.K. moved to a homeless shelter in the District after Jones closed.

the amount of money that had been promised. The GAL stated that she had "been given different dollar amounts between $500 and $1800," and the CFSA social worker advised that the amount "was first $1800" but indicated that it might have been lowered to an unspecified amount. The Jones representative present at the permanency hearing stated that he had "heard that it was $800." A different representative from Jones advised the court over the telephone that because Jones was closing before D.K.'s twenty-first birthday, "there [wa]s no money" for D.K. because "[a]ll money is shut down after the 10th."

The trial court found the lack of information about the emancipation funds "problematic" and ordered CFSA to pay D.K.: "[T]his was money that was an incentive saved through [Jones] that [D.K.] would have received had [Jones] not closed at the last minute just a few weeks prior to his emancipation.... The court believes that the agency should make all efforts to obtain this money from [Jones] but should make up the difference if it is unobtainable from Jones ILP."

On December 16, 2010, the District moved for reconsideration and a stay of the December 6, 2010, ruling. The trial court granted the stay but denied the motion to reconsider on December 23, 2010, holding that it "was an appropriate use of its *parens patriae* role" to order the emancipation funds paid to D.K. because "time [was] short prior to emancipation, and the agency ha[d] indicated a likelihood ... that it would not provide [D.K.] with at least some of the resources requested by the GAL." The court noted that "[w]hile *parens patriae* is not unlimited, the [c]ourt finds it necessary to utilize this authority to step in to prevent [D.K.] from literally

being on the street without resources and supports in place to successfully emancipate from CFSA's care."

## II.  Analysis

■ The dispositive question we must decide is whether the trial court had statutory authority to order CFSA to pay emancipation funds to D.K.[2] To guide us in answering that question, we "defer to an agency's interpretation of a statute or regulation it is charged with implementing if it is reasonable in light of the statute (or rule), the legislative history, and judicial precedent." *Travelers Indem. Co. of Ill. v. District of Columbia Dep't of Emp't Servs.*, 975 A.2d 823, 826 (D.C.2009); *see also Kingsley v. District of Columbia Dep't of Consumer & Regulatory Affairs, Bd. of Accountancy,* 657 A.2d 1141, 1144–45 (D.C.1995) ("Where an administrative agency is delegated broad authority to administer a statutory scheme, this court defers to the agency's interpretation of the statute if reasonable."). "The agency's interpretation, therefore, is controlling unless it is plainly erroneous or inconsistent with the statute." *Taggart–Wilson v. District of Columbia,* 675 A.2d 28, 29 (D.C. 1996) (quotation marks omitted). Accordingly, we place great weight on CFSA's interpretation and administration of the applicable statutory and regulatory scheme.

### A.  The Neglect Statute and CFSA's Statutory Duties Do Not Require or Contemplate Emancipation Payments by CFSA

■ The trial court held that its duty to act as *parens patriae* for D.K. provided sufficient authority to order CFSA to pay D.K. the emancipation funds, but *parens*

---

**2.**  We express no opinion on the merits of any claim based on negligence or promissory estoppel that D.K. might choose to pursue

against the District or Jones challenging their failure to pay him emancipation funds. *Cf. In re C.W.,* 916 A.2d 158 (D.C.2007).

*patriae* authority, untethered to any statutory provision, is insufficient to support the order. "[A]lthough ... broad, '[*parens patriae* authority] must be exercised within the constraints established by the legislature.'" *In re C.W.*, 916 A.2d 158, 168 (D.C.2007) (quoting *T.S. v. M.C.S.*, 747 A.2d 159, 164 n. 3 (D.C.2000)); *see also In re J.J.Z.*, 630 A.2d 186, 193 (D.C.1993) (*parens patriae* authority cannot "substitute for the procedures enacted by the legislature ... [and it] must be exercised in proper circumstances and within statutory constraints." (citation omitted)).

■ The trial court's authority to order payment of emancipation funds, therefore, must be found in the Prevention of Child Abuse and Neglect Act of 1977 (the "Neglect Statute"), the purpose of which is to "promote the best interests of any child in the District ... who is alleged by petition filed in the Family Division of the Superior Court to be neglected, abandoned or abused," and to "marshall all existing facilities for addressing the problem of child abuse and neglect in the District." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, Report on Title IV of Bill No. 2–48, "The Prevention of Child Abuse and Neglect Act of 1977" at 1–2 (Mar. 29, 1977) (hereinafter "Committee Report"). To that end, the Neglect Statute "'provides a statutory framework for insuring that [neglected] children and, where appropriate, their families receive effective social services aimed at (1) promoting the physical and social health of the subject child; (2) reestablishing a wholesome family unit, if possible; and (3) in cases where the natural family unit is likely to remain detrimental to the child's best interests, providing a permanent domestic environment for such child as soon as possible.'" *In re G.G.*, 667 A.2d 1331, 1335–36 (D.C. 1995) (quoting Committee Report at 1).

· The neglect and abuse system is administered in such a way that the District, through CFSA, provides shelter and other necessities to neglected children who are unable to remain safely in their homes. *See, e.g.,* D.C.Code §§ 4–1301.02, –1303.03 (2011 Supp). CFSA's statutory duties are listed in D.C.Code § 4–1303.03, and they include "maintain[ing] a program of treatment and services for families of neglected and abused children," § 4–1303.03(a)(3), and "promot[ing] the safety of children, reunification of families, and timely permanent placements." § 4–1303.03(a)(11). Additionally, D.C.Code § 4–1301.02(3) lists what must be included in a CFSA "case plan" for a neglected child, and nowhere does it mention cash upon emancipation. Instead, the focus is on matters such as "the type of home or institution in which the child is to be placed," § 4–1301.02(3)(A), "assuring that the child receives safe and proper care," § 4–1301.02(3)(B), and, "for a child of [sixteen] years of age or over, ... programs and services which will help the child prepare for the transition from being a committed child to independent living." § 4–1301.02(3)(D). The thrust of these provisions is the child's well-being and development while he is under CFSA's care and supervision, which lasts only until the child emancipates from the abuse and neglect system. To hold that the Neglect Statute requires CFSA to pay a child directly upon his twenty-first birthday, when he is no longer under CFSA's supervision and is thus free to use the money in whatever way he chooses, would be inconsistent with the purpose and design of the Neglect Statute. We therefore cannot accept D.K.'s argument that the Neglect Statute provides support or authority for payment of emancipation funds, with no control or oversight of their use, to a child as he is

about to leave CFSA's custody by operation of law.[3]

## B. D.K.'s Contrary Arguments Are Unavailing

D.K. argues on appeal that the trial court's authority stems from various provisions of the Neglect Statute, the Superior Court Neglect Rules, and the DCMR. Specifically, he points to D.C.Code § 16–2323 (2011 Supp.), which requires the trial court to hold permanency hearings every six months to "provide for detailed oversight of the adequacy of the planning being done by the agency," see § 16–2323(a)(1); requires the agency to submit a report to the trial court that details, inter alia, the services the child is receiving, § 16–2323(d)(1); and dictates that the court "determin[e] the [child's] permanency plan." § 16–2323(c). According to D.K., because CFSA must provide him with services, and because the trial court has "the authority and obligation to approve, reject or modify agency plans for the care of children within the court's jurisdiction," the court also had the authority to order CFSA to pay him the emancipation funds.

D.K. also relies on D.C.Code § 16–2320(a), which provides that after a child has been adjudicated neglected, the court may order one of a list of enumerated "dispositions" in furtherance of the child's best interest. See D.C.Code § 16–2320(a)(1)–(6). The choices available to the court include permitting the child to remain in the home subject to court-imposed conditions, transferring legal custody, or terminating parental rights to facilitate adoptive placement. See, e.g., D.C.Code § 16–2320(a)(1), (3), (6). D.K.'s argument centers on § 16–2320(a)(5), which allows the trial court to "make such other disposition as is not prohibited by law" that the judge deems to be in the child's best interest, including the authority to "order [an agency like CFSA] to provide any service the [court] determines is needed and which is within such agency's legal authority." D.K. argues that § 16–2320(a)(5), "whether standing alone or in combination with § 16–23[23], provides ample authority for the order issued by the trial court here."

█ D.K.'s claims fail because the trial court's authority under § 16–2323 to oversee CFSA's plans for neglected children does not provide it with the authority to order CFSA to do something that is "beyond the reach of the statute," G.G., 667 A.2d at 1337, and § 16–2320(a)(5) speaks only to case "dispositions." See, e.g., In re S.C.M., 653 A.2d 398, 405 (D.C. 1995) (affirming the trial court's authority under § 16–2320(a)(5) to order a "disposition" that transferred physical but not legal custody of a neglected child back to her mother). An order requiring CFSA to pay emancipation funds is not a "disposition" under any natural reading of § 16–2320(a). On the contrary, the statutorily enumerated "dispositions" are "placements" in various settings, including the child's own home, the home of a relative, CFSA's custody, or a facility providing medial or psychiatric treatment. § 16–

---

**3.** CFSA often fulfills its statutory duties through the use of independent contractors like Jones. We see nothing in the Neglect Statute to prevent an ILP, on its own initiative, from paying emancipation funds as part of an incentive program, assuming that CFSA finds that the ILP is fulfilling its contractual duties to use funds received from CFSA to satisfy the statutory purposes for which they are provided. However, nothing D.K. cites requires CFSA to honor an ILP's promise of emancipation funds. Furthermore, in this case the record is devoid of any information about the contract or obligations between Jones and CFSA that might support a holding that CFSA obligated itself to pay D.K. in the event that Jones did not.

2320(a)(1)–(4). Our interpretation of a "disposition" under § 16–2320(a)(5) is based "upon reading the whole statutory text, [and] considering the purpose and context of the statute.... [Furthermore, a] word is known by the company it keeps—a rule that is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to [a statute]." *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486–87, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006) (quotation marks omitted); *see also Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 426 & n. 2 (D.C.2009). Thus, whatever the catch-all authority in § 16–2320(a)(5) may encompass, it does not contemplate the payment of emancipation funds to a child about to leave the statutory scheme for the protection of neglected children.

■ D.K. also argues that the trial court had the authority based on Superior Court Neglect Rules 33 and 34. Rule 33 requires that the agency, in its report to the trial court, set forth a "plan to prepare the child for independent living...." Super. Ct. Neg. R. 33(i)(3). Rule 34 dictates that after the permanency hearing, "the judicial officer shall promptly make findings and enter an order" that shall include a statement of "[w]hat services, supervision, and *support* for the child should be provided or arranged by the agency." Super. Ct. Neg. R. 34(f)(3)(B) (emphasis added). According to D.K., the trial court's order of emancipation funds is valid because CFSA was required to prepare him for independent living, *see* Super. Ct. Neg. R. 33(i)(3), and because the trial court was authorized by Rule 34 to order that CFSA provide him with "support," which he argues can mean money. Finally, D.K. points to 29 DCMR § 6348.3(d) (2002), which requires an ILP like Jones to create a discharge plan for departing residents that includes "[t]he supports and resources

to be provided to the resident in preparation for the discharge." D.K. again urges us to hold that the word "support" indicates that CFSA can be ordered to pay money directly to him upon his emancipation.

D.K.'s reading of the word "support" in the Neglect Rules and the DCMR to mean a cash payment of *emancipation funds* conflicts with the Neglect Statute and is therefore unsupportable. *See, e.g., Harvey v. District of Columbia Bd. of Elections & Ethics*, 581 A.2d 757, 759 (D.C.1990) ("[A] statute defines the rights of the [parties] and fixes the standard by which such rights are to be measured. The regulation constitutes only a step in the administrative process. It does not, and could not, alter the statute." (alterations in original) (quotation marks omitted)). While we do not hold that "support" under the rules can never mean money, it cannot mean money paid to a neglected child for use after his emancipation, when he is beyond CFSA's supervision, because that interpretation would conflict with the Neglect Statute.

### III. Conclusion

We conclude that although the trial court was acting "conscientiously in what [it] believed to be [D.K.'s] best interests," *T.S.*, 747 A.2d at 162, in this case it exceeded its authority under the Neglect Statute, implementing regulations, and court rules when it ordered CFSA to make a direct payment of money to an emancipating child. Accordingly we vacate the trial court's order to the extent it directs CFSA to pay D.K. emancipation funds.

*So ordered.*